UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MTH HOLDINGS CORP., | ) | CASE NO. 5:14CV605 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| OTC SERVICES, INC. et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

In this contract dispute, plaintiff MTH Holdings Corp. ("MTH") has moved for judgment on the pleadings on its claim for declaratory judgment and Count I of the counterclaim. (Doc. No. 15 ["MJP"]; Doc. No. 16, ["Unsealed MJP"].)[1] Defendant OTC Services, Inc. ("OTC") opposes the motion (Doc. No. 17 ["Opp."]), and MTH has replied (Doc. No. 18 ["Reply"]; Doc. 19 ["Unsealed Reply"]).

I. **BACKGROUND**

MTH is a Virginia corporation with its principal place of business located in Virginia. (Doc. No. 1 ["Compl."] ¶ 2.) OTC is a Delaware corporation that maintains its principal place of business in Ohio. (*Id.* ¶ 3.) "On or about March 30, 2012, MTH and OTC entered into an Asset Purchase Agreement ("APA") pursuant to which MTH sold to OTC . . . certain identified assets for a stated purchase price. . . ." (*Id.* ¶ 10.) While it is not entirely clear from the pleadings, it would seem that, in addition to the transfer of

---

[1] Given the confidentiality concerns regarding the underlying contract, the Court granted the parties leave to place certain filings under seal. (Doc. No. 14 [Order to File under Seal].)

certain assets, the parties' agreement involved the maintenance of certain leased property upon which environmental cleanup efforts were anticipated. The APA provided for the creation of several escrow funds, each of which was designed to facilitate the execution of different aspects of the APA. Defendant JPMorgan Chase Bank, NA ("JPMorgan") was designated to serve as the escrow agent to hold the various escrow funds in trust. (*Id*. ¶ 12.)

Two of the escrow funds are central to the present motion. According to the APA, the "***Environmental Reserve***" –

> [referred to] One Million United States Dollars (US$1,000,000.00), to be held pursuant to the Escrow Agreement for the purposes of paying any costs associated with the Additional Environmental Work on the Leased Real Property in accordance with Section 7.5.2.

(Doc. No. 15-1 [APA] at 192,[2] underlining in original; *see also* Doc. No. 10-1 ["Unredacted APA"].) Section 7.5.2, "Additional Environmental Work," in turn, provided, in relevant part:

> As promptly as practical following the Closing, Seller shall, or shall cause the Landlord to, undertake and complete additional environmental assessments and any associated cleanup work on the Leased Portion as described on Schedule 7.5.2 attached hereto (the "***Additional Environmental Work***"), which schedule specifies the cleanup thresholds relating to any Hazardous Materials to be achieved through the Additional Environmental Work. Seller and Buyer shall seek to obtain two separate written estimates (the "***Estimates***" and each an "***Estimate***"), each prepared by a reputable contractor or engineering consultant mutually agreed upon by the parties and at Seller's expense, showing the projected expenses of performing the contemplated Additional Environmental Work. Promptly following receipt of two Estimates that are reasonably acceptable to Buyer and Seller, Buyer and Seller shall execute and deliver joint written instructions to the Escrow Agent directing that a portion of the Environmental Reserve equal to the positive amount, if any, of (i) the

---

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

2

> initial amount of the Environmental Reserve ($1,000,000) less (ii) 120% of the amount of the highest Estimate, be disbursed to Seller. The remainder of the Environmental Reserve shall be retained in the Escrow Fund until disbursed pursuant to this Section 7.5.2. . . .

(APA, § 7.5.2(a), at 196, underlining and bolding in original.) Section 7.5.2 did not reference any other escrow funds. This section did, however, provide that "[i]t is expressly understood and agreed that if the costs and expenses of the Additional Environmental Work is in excess of the Environmental Reserve, then Seller shall be solely responsible for, and shall promptly pay, such excess costs and expenses." (APA, § 7.5.2(a), at 196-97.)

As part of the Additional Environmental Work contemplated by Section 7.5.2, MTH agreed to perform "certain Soil Cleanup Goals for hazardous materials, including a cleanup goal for Polychlorinated Biphenyl ("PCBs") . . . ." (Doc. No. 7 ["Counterclaim"] ¶ 11; Unredacted APA at 157.)

The second escrow fund at issue herein—the "*Indemnity Reserve*"—constituted:

> Two Million United States Dollars (US$2,000,000.00), together with all accumulated interest and earnings thereon, if any, to be held for a period of 18 months following the Closing Date pursuant to the Escrow Agreement for the purposes of paying any indemnity claims pursuant to Section 12.2.

(APA at 194, underlining in original.) Article 12 of the APA addressed indemnification. Section 12.2 governed MTH's indemnification duties as the seller, and provided:

> From and after the Closing Date, Seller will indemnify and hold harmless Buyer, and its Representatives, stockholders, members, partners, controlling persons, and Affiliates (collectively, the "*Buyer Indemnified Persons*") for, and will pay to the Buyer Indemnified Persons the amount of, any loss, liability, claim, damage, cost of settlement, compromise or investigation, expense of any kind or nature whatsoever (including,

3

>without limitation, reasonable attorneys', accountants' and experts' fees), and whether or not involving a third-party claim (collectively, "*Damages*") actually incurred by the Buyer Indemnified Persons arising from or in connection with: . . . .

(*Id*. at 200-01, bolding in original.)

Section 12.2 contained a list of seven (7) categories of liabilities or claims that were covered by the Indemnity Reserve, with the last category covering "the matters contemplated by Section 7.5.3." (*Id*., § 12.2.7, at 201, underlining in original.) Section 7.5.3, "Indemnification for Environmental Matters[,]" provided that:

>Notwithstanding anything to the contrary set forth in this Agreement, Seller shall indemnify and hold harmless the Buyer Indemnified Persons from and against any and all Damages (including any costs of cleanup, containment, or other remediation) resulting from, arising out of, relating to, or caused by any of the following: . . . .

Section 7.5.3 contained a laundry list of categories of environmentally related damages that could be satisfied by the Indemnity Reserve. (*See* APA, § 7.5.3(a) – (e), at 197-98.) Among the categories of covered damages were certain "Hazardous Materials," as that term was defined in the APA, "Hazardous Activity," as that term was also specifically defined in the APA, and bodily injury resulting from any "Hazardous Activity" occurring on the property. (*Id*.)

Section 12.6 of the APA addressed the procedure for making claims against and release of the Indemnity Reserve funds. Section 12.6.3 was directed to the distribution of any unused portion of the Indemnity Reserve to MTH and provided:

>On the eighteenth-month anniversary of the Closing Date, the Escrow Agent shall release to Seller the balance of any remaining Escrow Fund less any amounts sufficient to satisfy any then-pending indemnification claim(s) previously asserted in good faith by Buyer Indemnified Persons.

4

(*Id*. at 204.) In the event that the Indemnity Reserve was exhausted and additional indemnity claims remained unsatisfied, the APA provided OTC with the right to "seek recourse directly from [MTH] and/or from" MTH's personal guarantor. (*See id*., § 12.6.2, at 204.) Section 12 of the APA did not reference any other escrow funds.

The parties do not dispute that September 30, 2013 represented the 18-month anniversary of the closing date of the APA. (*See* Compl. ¶ 15.) "On or about September 18, 2013," OTC sent a letter to MTH and JPMorgan, entitled "Escrow Claim Notice," and which contained a demand that the Indemnity Reserve be released to OTC. (Compl. ¶ 17; Doc. No. 1-4 ["Claim Notice"] at 15.) The Claim Notice purported to be a claim "pursuant to Sections 12.2 and 7.5.3" of the APA. In support of its claim, OTC maintained that "additional environmental work required by Sections 7.5.2 and possibly 7.5.3 [on the leased property] will cost significantly more than the amount remaining in the Environmental Reserve." (*Id*.) As such, OTC indicated that it was "making a claim for the entire Indemnity Reserve to assure that the additional environmental work is completed." (*Id*.)

MTH opposed OTC's request that the Indemnity Reserve be distributed to OTC to satisfy the cost of the Additional Environmental Work. In a response letter, dated September 26, 2013, MTH insisted that it had diligently completed, and continues to diligently complete, the Additional Environmental Work. (Doc. No. 1-5 ["Claim Response"] at 16.) According to MTH, "[f]unds remain[ed] in the Environmental Reserve, and [MTH] reasonably believe[d] that the Environmental Reserve [would] be sufficient to complete the remaining Additional Environmental Work." (*Id*.)

On March 20, 2014, MTH filed the present lawsuit. In its only claim for relief, MTH seeks "a declaration that the entirety of the Indemnity Reserve is due and owing to MTH and should be released to MTH, and [] an Order directing JPMorgan as escrow agent to release the Indemnity Reserve in its entirety to MTH." (Compl. ¶ 24.) MTH further requests "an award of damages against OTC, in an amount to be determined at trial, sustained by MTH as a consequence of OTC's refusal to authorize release of the Indemnity Reserve to MTH." (*Id.* ¶ 25.)

In its answer to the complaint, OTC denied that MTH had a right to the funds in the Indemnity Reserve. Additionally, OTC filed a two count counterclaim. (Doc. No. 7 ["Answer and Counterclaim"].) Count I seeks declaration that: "(1) MTH has failed to comply with its contractual obligations to complete the Additional Environmental Work; (2) OTC's Escrow Claim Notice was proper; and (3) the Indemnity Reserve should be immediately released to OTC." (Counterclaim ¶ 34.) Count II alleged breach of contract, based upon MTH's alleged failure to complete the Additional Environmental Work, and sought monetary damages, interest, costs, and attorneys' fees. (*Id.* ¶¶ 36-38.)

## II.  GOVERNING CASE LAW

### A.  Standard of Review

Motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) are generally analyzed under the same standard as motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 423 (6th Cir. 2013) (citing *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001)). All allegations of fact by the non-moving party are accepted as true and are construed in the light most favorable to that party. *See Grindstaff v. Green*, 133 F.3d 416,

421 (6th Cir. 1998) (citing *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990)). The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). "The motion is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991) (citation omitted).

In entertaining a Rule 12(c) motion, the Court may consider documents that are referred to in the pleadings and are integral to the claims without converting the motion to one for summary judgment. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007) (citation omitted); *see also Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (court may consider documents that govern a party's rights and are necessarily incorporated by reference in the complaint without converting the motion to dismiss to a summary judgment motion). The APA and the correspondence between the parties relating to the allegedly unfinished Additional Environmental Work are specifically referred to in-+ and, in the case of the correspondence appended to, the pleadings and are integral to the parties' claims. It is, therefore, appropriate to consider them in connection with MTH's Rule 12(c) motion.

### B. Contract Interpretation

In this diversity action, the Court applies the substantive law of Ohio to the present contract dispute. (Unredacted APA at 133 ["This agreement will be governed

7

by the laws of the State of Ohio without regard to conflicts of laws principles."]); *see Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) (citation omitted). "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted); *see Ohio Historical Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 345 (Ohio Ct. App. 1989). It is the role of the Court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Savedoff*, 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)); *see United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998). "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, No. 3:10 CV 2296, 2011 WL 4376123, at *2 (N.D. Ohio Sept. 20, 2011) (internal citations omitted).

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (citation omitted); *see Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009). When both parties offer "plausible interpretations of the agreement drawn from the contractual language itself [this] demonstrates that the provision is ambiguous." *Int'l Union UAW Local 91 v. Park-Ohio Indus., Inc.*, 876 F.2d 894, 1989 WL 63871, at *6 (6th Cir. 1989) (unpublished table decision).

In determining whether contractual language is ambiguous, the contract "must be construed as a whole." *Tri-State Grp., Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio Ct. App. 2002) (internal citation and quotation marks omitted). Further, "courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (internal citation and quotation marks omitted).

### C. Declaratory Judgment

The Declaratory Judgment Act provides that a federal Court's power to give a declaratory judgment is permissive, not mandatory. *See Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 325 (6th Cir. 1984) (citing 28 U.S.C. § 2201). This discretionary power may only be exercised where there is an "actual controversy." 28 U.S.C. § 2201. The "controversy" at issue "must be definite and concrete, touching the legal relationship of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937).

The Court finds that there is an actual controversy that is definite and concrete, and that the factors the Court must consider before awarding declaratory relief weigh in favor of making such a declaration. *See Long v. CVS Caremark Corp.*, 695 F. Supp. 2d 633, 639-40 (N.D. Ohio 2010) (relevant factors relating to the exercise of discretion to award declaratory judgment include whether: declaratory relief would settle the controversy, a legal declaration would clarify the legal issues, declaratory judgment is

9

being used for procedural fencing, such an award would increase friction between the federal and state courts, and there is a superior alternative remedy) (citing *Grand Trunk*, 746 F.2d at 326). Moreover, neither party disputes that a declaratory judgment is appropriate in this case—only to whom such declarations should be made.

### III. DISCUSSION

It is MTH's position that because the anniversary date has passed without OTC incurring any damages contemplated under Section 7.5.3, MTH is entitled to the Indemnity Reserve funds. In reaching this conclusion, MTH underscores the fact that the Soil Cleanup Goals constituted Additional Environmental Work, as that term was defined in the APA, and that OTC may only use the Environmental Reserve—or when those funds are depleted, an action for damages—to satisfy these costs. In the event that the Court finds that the Indemnity Reserve is available, however, MTH argues that OTC failed to make a proper claim for the funds. (MJP at 177, 182-85.)

OTC concedes that the allegedly unfulfilled "Soil Cleanup Goals" constitute "Additional Environmental Work." (*See* Counterclaim ¶¶ 19-20.) While OTC looks first to the Environmental Reserve to finance these costs, it insists that it may also look to the Indemnity Reserve because it "was intended to serve as a backstop to the Environmental Reserve in the event the Additional Environmental Work resulted in cost or liability in excess of the Environmental Reserve." (*Id*. ¶ 18; *see also id*. ¶¶ 16-17.) In support, OTC observes that the APA identified several broad categories of liabilities that could be satisfied by the Indemnity Reserve, including "environmental matters." (*See* APA, §§ 7.5.3 and 12.2.7.) OTC argues that the APA "was very plainly intended to cover the environmental claims that [it] has asserted." (Opp. at 221.)

There are several problems with OTC's position not the least of which is that the APA identified the universe of damages that could be satisfied with the funds from the Indemnity Reserve; a universe that did not include the Additional Environmental Work. The definition of the Indemnity Reserve states that this escrow fund is to be held "for the purposes of paying any indemnity claim pursuant to <u>Section 12.2</u>. (APA at 194, underlining in original.) While "environmental matters" under Section 7.5.3 were specifically identified as covered under Section 12.2, "Additional Environmental Work" under Section 7.5.2 was not identified. (*Id*. § 12.2.7.)

It is a guiding principle of contract law that the expression of one thing is the exclusion of another. *See Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 890 (S.D. Ohio 2013) (Under Ohio law, the canon of "[e]*xpressio unius est exclusio alterius*" means that "if certain things are specified in a law, contract, or will, other things are impliedly excluded.") (citations and quotation marks omitted); *Nat'l Fire Ins. Co. v. Roofmaster Constr., Inc.*, No. 04-CV-71142-DT, 2005 WL 1030326, at *10 (E.D. Mich. Apr. 28, 2005) ("The general principle of contract interpretation, *expressio unius est exclusio alterius*, holds that a specific mention of one thing implies an intent to exclude another.") By specifically identifying certain categories of liabilities and claims that can be satisfied by the Indemnity Reserve, it follows that other categories not specifically identified—such as Additional Environmental Work—cannot be similarly satisfied.

Further, OTC's suggestion that Additional Environmental Work should be contemplated as falling within the broad category of "environmental matters" is unreasonable because a more specific section governs such damages. It is also a well

11

settled canon of contract construction that specific language prevails over general contract language. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 903 (6th Cir. 2006) ("Under Ohio law, a specific provision controls over a general one.") (citation and quotation marks omitted). The parties intentionally carved out of possible environmental damages those involving Additional Environmental Work. They specifically defined that term in the APA and limited the remedy for the incurrence of such damages to the funds in the Environmental Reserve and an action for damages. For this reason, OTC's allegation that the Indemnity Reserve was intended to serve as a "backstop" for the Additional Environmental Work finds no support in the four corners of the agreement, and it amounts to an unwarranted factual inference that need not be considered as true for purposes of MTH's Rule 12(c) motion. *See Mixon*, 193 F.3d at 400 (citing *Morgan*, 829 F.2d at 12.)

Even construing all of the factually warranted allegations in a light most favorable to OTC, MTH is entitled to declaratory relief in its favor. OTC concedes that the allegedly unfinished Soil Cleanup Goals constituted Additional Environmental Work, and further concedes, as it must, that the Environmental Reserve was specifically intended by the parties to cover such costs. (Counterclaim ¶¶ 16, 19, 20.) The parties could have contracted for the right to use the Indemnity Reserve to cover the expense from Additional Environmental Work not satisfied by the Environmental Reserve, but they did not do so. The Court will not rewrite the terms of the APA to provide for a contingency not contemplated by the parties.

In the event that the Court found—as it now has—that MTH is contractually entitled to the funds from the Indemnity Reserve, OTC argues that MTH's

"unclean hands" should preclude it from recovering the funds. The clean hands doctrine provides that a party cannot seek equitable relief from the court "'where that party has engaged in reprehensible conduct with respect to the subject matter of the action.'" *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 918, 942 (W.D. Ky. 2007) (quoting *O'Brien v. Ohio State Univ.*, 859 N.E.2d 607, 618 n.3 (Ohio Cl. Ct. 2006)). "The Sixth Circuit has stated that the remedy afforded under the Federal Declaratory Judgment Act is equitable in form." *Id.* (citing *Am. Airlines, Inc. v. Louisville & Jefferson Cnty. Air. Bd.*, 269 F.2d 811, 824 (6th Cir. 1959)).

For the clean hands doctrine to apply, "the offending conduct must constitute reprehensible, grossly inequitable, or unconscionable conduct, rather than mere negligence, ignorance, or inappropriateness." *Deutsche Bank Nat'l Trust Co. v. Pevarski*, 932 N.E.2d 887, 894 (Ohio Ct. App. 2010) (citation and quotation marks omitted); *see also Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 784 (6th Cir. 2003) (approving of district court's observation that "fraud or unclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence.") (quoting *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir. 1977)); *see, e.g., Marinaro v. Major Indoor Soccer League*, 610 N.E.2d 450, 452 (Ohio Ct. App. 1991) (professional athlete engaged in reprehensible conduct and, therefore, had unclean hands, where he accepted bribes in exchange for "throwing" soccer games). "Furthermore, the []clean hands doctrine should not be imposed where a party has legal remedies available to address an opposing party's asserted misconduct." *Deutsche Bank Nat'l Trust Co.*, 932 N.E.2d at 894 (citations and quotation marks omitted).

Here, OTC has alleged that MTH failed to fulfill its duty to complete the Additional Environmental Work identified by the parties. (Counterclaim ¶¶ 19-20.) It further alleges that that the cost of the unfinished work will exceed the amount remaining in the Environmental Reserve. (*Id*. ¶ 23.) These allegations, accepted as true, establish nothing more than a simple breach of contract and do not rise to the level of reprehensible conduct necessary to support the affirmative defense of unclean hands. *See, e.g., Westlake Vinyls, Inc*., 518 F. Supp. 2d at 942 (misrepresentations regarding the existence of a side agreement, in the context of a sale of certain real property, did not rise to the level of reprehensible conduct).

Application of the clean hands doctrine would be inappropriate for the additional reason that OTC has a remedy at law to address the alleged breach of the APA. As set forth above, the APA provides for an action at law to remedy MTH's alleged failure to complete the designated Additional Environmental Work. Indeed, OTC has taken advantage of this provision in the APA and has raised a counterclaim for breach of contract. (Counterclaim, Count II, ¶¶ 36-38.) Therefore, the Court finds that the clean hands doctrine is not a viable defense and does not stand as an impediment to MTH's request for declaratory relief.

Accordingly, MTH is entitled to judgment, as a matter of law, on its asserted claim to the extent that it seeks a declaration that the Indemnity Reserve is due and owing to it, and that JPMorgan should be instructed to release the Indemnity Reserve to MTH. (*See* Compl. ¶ 24.) For all of the same reasons, MTH is entitled to judgment in its favor on Count I of OTC's counterclaim, to the extent OTC seeks a declaration that OTC made a proper claim upon the funds from the Indemnity Reserve and that such

14

funds should be immediately released to OTC. (*See* Counterclaim, Count I, ¶ 34.) Further, because OTC is not entitled, as a matter of law, to the proceeds in the Indemnity Reserve, the Court need not reach MTH's alternative argument that OTC did not make a contractually sufficient claim against the Indemnity Reserve.

MTH's declaratory judgment claim also seeks monetary damages, attorneys' fees and costs. (Compl. ¶ 25.) While 28 U.S.C. § 2202 permits an award of "[f]urther necessary or proper relief[,]" it is entirely unclear from the pleadings whether such an award would be appropriate in this case, and the parties did not address this issue in the briefs. *See Cedar Hill Hardware & Constr. Supply v. Ins. Corp. of Hannover*, 563 F.3d 329, 356-57 (8th Cir. 2009) ("district courts have broad power under 28 U.S.C. §2202 to craft damages awards in declaratory judgment actions to effectuate their judgment") (citation omitted); *Norfolk & W. Ry. Co. v. Greater Cleveland Reg'l Transit Auth.*, 124 F.3d 198, 1997 WL 599561, at *5-*6 (6th Cir. 1997) (unpublished table decision) (trial court did not abuse its discretion in denying attorneys' fees in declaratory judgment action where no statute permitted such recovery and there was no evidence of fraud). Additionally, it is possible that any potential monetary award to MTH would be subject to a set-off against any award that OTC may obtain in connection with Count II of the counterclaim. These issues will need to be determined at a later date.

In like fashion, the portion of Count I of OTC's counterclaim seeking a declaration that MTH has failed to complete the Additional Environmental Work, and all of Count II, also remain at issue in this litigation. While OTC alleges that MTH failed to meet its obligation to complete the Additional Environmental Work, MTH asserts that it

has satisfied—or is continuing to satisfy—its contractual obligation to perform this work. Obviously, this is an issue that will be explored during discovery.

## III. CONCLUSION

Based upon the foregoing, the Court finds as follows: MTH's motion for judgment on the pleadings on its claim for declaratory judgment is granted; MTH's motion for judgment on the pleadings on Count I of OTC's counterclaim is GRANTED in part, and DENIED in part, as explained in this Opinion and Order. The Court DECLARES that the entirety of the Indemnity Reserve identified in the parties' Asset Purchase Agreement is due and owing to MTH; and hereby ORDERS JPMorgan, as escrow agent, to release the Indemnity Reserve to MTH.

**IT IS SO ORDERED**.

Dated: January 15, 2015

                                                       **HONORABLE SARA LIOI**
                                                       **UNITED STATES DISTRICT JUDGE**